

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
for Roanoke
JUN 0 6 2008
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

RASHADI ANDRE WEARING,    )    CASE NO. 7:07CV00253
    )
    Petitioner,    )
    )
v.    )    <u>REPORT AND RECOMMENDATION</u>
    )
UNITED STATES OF AMERICA,    )
    )    By:    B. WAUGH CRIGLER
    Respondent.    )        U.S. MAGISTRATE JUDGE

On May 18, 2007, Rashadi Andre Wearing ("petitioner") filed a petition to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 ("petition"), which he amended on June 20, 2007.[1] The United States moved to dismiss, and on August 28, 2007, the case was referred to the undersigned under the authority of 28 U.S.C. § 636(b)(1)(B), to conduct all necessary proceedings and render to the presiding District Judge a report setting forth findings, conclusions and recommendations for the disposition of petitioner's claims.[2] For the reasons that follow, the undersigned will RECOMMEND that the presiding District Judge enter an Order DENYING petitioner's motion to vacate his sentence and DISMISSING this action from the docket of the court.

## FACTUAL BACKGROUND

On December 8, 2004, petitioner was indicted on two counts by the Grand Jury for the Western District of Virginia in a multi-defendant indictment. *United States of America v.*

---

[1] Petitioner submitted a letter with attachments he sought to have added to his petition. (Dkt. No. 7.) The court construed this letter as a motion to amend his petition and granted the motion. (Dkt. No. 8.)

[2] An evidentiary hearing in this case originally was set for January 18, 2008, but was continued twice, once at the request of petitioner's counsel, and a second time at the request of counsel for the Government. (Dkt. Nos. 18, 20, 26.)

*Rashadi Andre Wearing*, Criminal No. 3:04CR00092-8.[3]  In Count One petitioner was charged

with being involved in a conspiracy to distribute more than fifty grams of a mixture or substance

containing a detectable amount of crack cocaine, in violation of 21 U.S.C. § 846.  In Count Five,

petitioner was charged with possession of a firearm by a convicted felon, in violation of 18

U.S.C. § 922(g).  On August 8, 2005, petitioner entered a plea of guilty to Count One.  On June

28, 2006, petitioner was sentenced to 262 months' imprisonment to be followed by a five-year

period of supervised release.

       The court initially appointed Helen Eckert Phillips, Esq. to represent petitioner.  In a letter

filed with the court on May 25, 2005, petitioner wrote the presiding District Judge asserting that

he was not receiving effective assistance of counsel.  Phillips subsequently moved to withdraw as

counsel, and her motion was granted on June 28, 2005.  The following day, Andrew L. Wilder,

Esq., was appointed to represent petitioner.

       In the petition, petitioner alleges Wilder provided him with ineffective assistance of

counsel by in the following ways:  (1) failing to file an appeal after being requested to do so; (2)

misleading him by allowing him to enter into an "unknowing, involuntary, and unintelligent

plea"; (3) failing to inform the court that he was under the influence of medication that impacted

his ability to understand the proceedings; (4) failing to argue that his sentence was unreasonable

under *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553; and (5) failing to

argue the impropriety of his enhanced sentence.  On July 13, 2007, the Government filed a

_____

       [3]At the evidentiary hearing, petitioner referred to himself as "Rashid," though he was
named "Rashidi " in the criminal proceedings.  The witnesses in this case most often referred to
him as "Reshadi."  In lieu of some official notification of a name change, the undersigned will
continue to refer to him as "Rashadi."

Case 7:07-cv-00253-NKM-BWC   Document 33   Filed 06/06/08   Page 2 of 29   Pageid#: 234

motion to dismiss the petition, and petitioner filed a response. The presiding District Judge took under advisement the petition and referred the case to the undersigned on August 28, 2007. The undersigned appointed counsel, Willis J. Spaulding, II, Esq., to represent petitioner. On May 9, 2008, an evidentiary hearing was held.

**EVIDENCE PRESENTED**

In addition to the trial court record, some of which was reintroduced during the evidentiary hearing, the undersigned heard testimony presented by both petitioner, his stepfather, his mother, his uncle, and his former counsel, Andrew L. Wilder. That evidence is summarized below.

**PETITIONER'S CASE-IN-CHIEF**

**ANDREW L. WILDER, ESQ.**

Andrew L. Wilder ("Wilder") testified that he previously had represented Wearing in an unrelated state criminal proceeding and was assigned by the court to represent the petitioner when Ms. Phillips withdrew. Wilder has experience in thousands of cases involving mental illness, including bipolar disorders, as a special justice in the Sixteenth Circuit of Virginia presiding in involuntary civil commitments and as an attorney.

Wilder acknowledged Plaintiff's Exhibit Number 1 as petitioner's medication record and stated that, while he was aware that petitioner was on medications at the time he entered his guilty plea, he did not know exactly what they were. Wilder related that he had discussions with petitioner about his overall mental state, and believed that defendant "felt better" at the time he executed the plea agreement and entered his guilty plea to Count One of the Indictment because he had been taking his medication regularly while detained pending trial. When shown a page

3

from petitioner's Central Virginia Regional Jail ("CVRJ") medical records, Wilder acknowledged familiarity with the medical term "bipolar disorder" and remembered petitioner's medication was changed to Wellbutrin. (Pl's Exh. 2.)

Wilder was present with petitioner in court during the Rule 11 proceedings on August 8, 2005.[4] He stated had no independent recollection of the plea colloquy and explained that he could not recall whether the petitioner's responses to all the court's questions were truthful. Nevertheless, Wilder was aware that petitioner was on medications the day of his plea. Thus, to the extent any of petitioner's answers to the Rule 11 inquiry would have indicated he was not under the care of a physician or psychiatrist, those answers were not accurate. Petitioner had been treated for a bipolar disorder and was taking medications, and Wilder conceded that the judge was "not fully informed" on these particulars. He explained that petitioner was the third of the three co-defendants to respond to the court's inquiry. Wilder admitted he simply "was not listening" to the questions being posed. By the same token, Wilder did not believe, and does not now believe, petitioner was "under the influence" of medications in a way that impaired his ability to understand and participate in the plea proceedings.

Wilder related that he did not receive any file documents from Ms. Phillips when he took over the case, but he had been informed that Phillips withdrew because of petitioner's abusive calls to her office. Wilder knew that Phillips had participated in negotiating with the Government which had produced a plea offer to the petitioner. However, petitioner had declined

---

[4]The transcript reveals that the presiding court conducted a collective Rule 11 proceeding with petitioner and two co-defendants. He posed individual questions to the defendants, *seriatim*, regarding their identity, education and state of health. Then, he posed collective questions to all of the defendants addressing the Rule 11 inquiry which each defendant then answered in the order of their appearance.

4

to accept the offer.

Wilder testified that there were difficulties in the communications between petitioner and himself, and that "it was always a struggle." Petitioner only wanted to "talk about what he wanted" and nothing else, though this did not appear any different from other defendants Wilder had represented. At no time did Wilder believe petitioner was mentally ill or a candidate for a psychiatric evaluation. Wilder believed petitioner was capable of understanding the nature of the proceedings and the charges, and he was able to assist counsel.

Wilder testified that the petitioner understood the terms of his plea agreement. By the same token, petitioner never understood why the Government refused to make an outright promise that it would move to reduce his sentence in exchange for substantial assistance rather than reserving to itself the right to make that decision at a later time.

Wilder categorically denied any notion that the Government, at any time, had offered a specific term of incarceration. He further denied saying or doing anything that would have led petitioner or his family to expect a specific term of incarceration. Wilder stated that, despite a provision in the plea agreement foreclosing any motion for a downward departure, he actually asked the court at sentencing to consider imposing one.[5] He was as surprised as anyone when the presiding judge pronounced a 262-month sentence. Wilder believed this was a harsh sentence for someone whose role in the offense, relative to others, was as low as petitioner's.

Wilder was examined in detail about petitioner's mental status. He testified that he did

_____

[5]Petitioner's Plea Agreement provided that petitioner was accountable for more than 500 grams but less than 1.5 kilograms of cocaine base, possessed or used a firearm during his participation in the narcotics offense, and that he would not seek any departure from the recommended Guideline sentence other than as provided in the agreement. (Def's Exh. 2, Plea Agreement, pp. 2-3.)

5

not ask for a court-ordered psychiatric examination. Wilder acknowledged that the family sought and secured a psychological examination by David A. Israel, Ph.D., P.C., a licensed clinical psychologist, which occurred during the time between petitioner's plea hearing and sentencing. (Pl's Exh. 3.[6]) However, the sentencing court determined the report did not provide a basis to depart from the Guidelines recommendation. (Tr. Sentencing Hearing, p. 21.)

Wilder stated that he did not have any conversation with the petitioner about an appeal after petitioner's sentencing because petitioner immediately was removed from the courtroom. Wilder testified, "I know [petitioner] did not ask for an appeal," though Wilder conceded that he never informed the petitioner of any right to appeal after he was sentenced. Wilder denied any post-sentencing conversations with petitioner about the same. The first time the subject was addressed was when Wilder received a subsequent communication from petitioner on May 12, 2007, the day he filed the instant § 2255 petition, in which petitioner "asked about the status of his appeal."

Wilder was questioned by petitioner's counsel concerning a letter he wrote to petitioner on July 18, 2005.[7] (Def's Exh. 1.) Wilder stated that, at the time the letter was written, Wearing had advised him that he wanted to go to trial. Wilder explained that the bulk of the letter set forth the Government's case, with the penultimate paragraph addressing Wilder's need for information from petitioner that could provide a defense. Wearing never had offered Wilder any

_____

[6]Wilder offered the report at petitioner's sentencing hearing and argued that his psychological disorders should be given "significant consideration" by the court in determining "an appropriate sentence." (Tr. Sentencing Hearing, p. 19.)

[7]At the evidentiary hearing, the parties stipulated that the letter contained a typographical error in the date. While reflecting a date of "July 18, 1005," it was written on July 18, 2005, less than a month before petitioner was scheduled for trial.

6

defense to the charges up to that point. Wilder further testified that he visited the petitioner at the CVRJ after the July 18, 2005 letter was written, at which time petitioner decided he would forego a trial and, instead, plead guilty.

Cross examination continued on the contextual circumstances surrounding Wilder's July 18, 2005 letter to petitioner. Wilder stated that his letter followed a telephone conversation with and visit to the petitioner. The letter, itself, demonstrates that a number of topics were addressed, including petitioner's request to the trial court for new counsel, the proposed plea agreement by the Government, the results of Wilder's discussions with the Probation Office, the prospect that the Government might exercise its discretion to seek a reduction in sentence, and the risks related to trial should petitioner elect to proceed to trial. Wilder explained that petitioner "had no case." He had given a confession and had made proffers to Government agents, as had most of the co-conspirators. All the while, Wilder knew that he only could counsel petitioner in a course of action. In the end, the decision remained with the petitioner. Wearing eventually decided to accept the plea agreement, which petitioner initialed and signed in Wilder's presence.

Wilder acknowledged that the plea agreement contained no promises of a fixed sentence, though it did provide a lower drug weight than could have been proved. It also contained the provision affording petitioner an opportunity to provide substantial assistance, but without any promise or representation that the Government later would move for a reduction of sentence under §5K of the Guidelines. In addition, the Government agreed it would not ask for an enhancement other than as stated in the plea agreement, and the petitioner agreed not to seek a downward departure from the Guidelines range. Once more, Wilder confirmed that despite such agreement, he did ask the court to depart downward. The request was not honored.

7

Petitioner united events after the Rule 11 proceedings which, according to Wilder, hardened the Government against moving for any sentence reduction. Though no documentary evidence was offered to the undersigned, no one disputed that petitioner sent a letter to Assistant United States Attorney ("AUSA") Timothy J. Heaphy charging him with tailoring or coaching the testimony witnesses in another case who were detained with petitioner at CVRJ. Apparently this raised such serious legal issues in the other prosecution that Heaphy decided not to extend §5K benefits to petitioner.

Wilder was clear that petitioner understood the terms of the plea agreement, including the ones relating to effectiveness of counsel. Wilder stated that he informed petitioner of his obligation under the agreement to raise any questions about Wilder's effectiveness before he was sentenced. Wilder recalled petitioner's testifying at the plea colloquy that he was satisfied with Wilder's representation of him. At no time did petitioner indicate to Wilder that he did not understand the terms of the plea agreement.

Wilder once more acknowledged prior representation of petitioner in state court, and confirmed his awareness that petitioner had "psychological issues." However, petitioner never displayed to Wilder any signs of "psychosis," and he never indicated to Wilder that he failed to understand any of the proceedings. For Wilder, Dr. Israel's report confirmed his own observations that petitioner was fully competent, and it revealed that petitioner enjoyed an above average I.Q.

Wilder mailed petitioner a copy of the Presentence Report prior to sentencing. Then, he met with petitioner and went over the report "paragraph by paragraph." He stated that petitioner had no disagreement with anything set forth in the report, and he found nothing "inaccurate."

8

Wilder offered that the Government would have been able to prove a greater drug weight than the plea agreement attributed to the petitioner, and he called several witnesses, including some of those testifying at the evidentiary hearing, to provide the court with more favorable evidence for sentencing.

Wilder confirmed that the sentencing court advised petitioner of his rights and that the letter of May 12, 2007 was the first time petitioner said anything about Wilder's taking an appeal. (Def's Exh. 3.) Wilder responded on May 27, 2007, controverting petitioner's allegations, detailing the facts as he knew them and counseling petitioner about the effects of challenging his sentence. (Def's Exh. 4.) Wilder categorically denied that either the petitioner or any of his family members requested that he appeal the sentence. He explained that, immediately after sentencing, he had a discussion with petitioner's mother and stepfather. Everyone was "disappointed" in the sentence, and Wilder was disappointed that the sentencing judge had failed to account for petitioner's mental health background as revealed by Dr. Israel and the other evidence. Wilder denied that the family ever had asked him to request a court-ordered mental health evaluation of petitioner prior to sentencing. Instead, the family simply informed him that it had engaged Dr. Israel on its own.

Wilder recalled that, after he had filed an affidavit in this case, petitioner's stepfather, Wilfredo Pesante, called him. Wilder informed Pesante that he would no longer would be "involved" with petitioner's case.

On redirect, Wilder denied ever going over any questions with Wearing that might be asked by the trial judge at the plea hearing, or instructing petitioner how to answer each question, or warning petitioner that the plea hearing would "stop" if he gave "incorrect answers," or

9

advising petitioner that suppressing information about his mental health would benefit him. Wilder stated that it was his judgment that providing the mental health information to the court likely would help explain some of petitioner's "quirky" pretrial behavior. Wilder held off on the Dr. Israel report, however, until after he had been made aware that the Government would not move for a §5K reduction. He offered that it was his tactical decision not to call Dr. Israel at the sentencing hearing. Wilder knew petitioner was competent, petitioner had informed him "he was functioning fine on his medications," and Dr. Israel's written report was consistent with the other historical evidence that petitioner had been treated for a bipolar disorder. This provided all he considered necessary for the court to grant a downward departure after the §5K reduction had been "taken off the table."

On re-cross examination, Wilder testified that the plea agreement offered by the Government was in its standard form. He further revealed that petitioner actually was sentenced at the low end of the Guidelines range.

**WILFREDO PESANTE, ESQ.**

Pesante, a 1992 graduate of the University of Virginia School of Law, is the petitioner's stepfather.[8] Pesante attended petitioner's sentencing hearing, and the transcript reflects he testified in those proceedings.[9]

─────────────────

[8]Pesante later revealed that he is admitted to practice in the state and federal courts of New York and the District of Columbia, as well as in the Fourth Circuit Court of Appeals. He concentrates his practice in the areas of corporate, employment, civil rights and constitutional and intellectual property law.

[9]Pesante's testimony in these proceedings was marked by his recharacterizing counsel's questions so as to both ask and answer the form of question he wished the court to entertain. The undersigned admonished Pesante on more than one occasion that he was a witness in these proceedings, not petitioner's counsel, even to the point of threatening to terminate the

10

According to Pesante, in a conversation with Wearing prior to sentencing, the petitioner told Pesante that Wilder told him that ten years was the maximum sentence he could receive. Pesante informed the court that he was aware of petitioner's mental disorders which manifested themselves in difficulties in memory, reading and math. While petitioner could "do anything," he did not perform to his potential, and he often would fabricate stories about events because, according to Pesante, he had "forgotten what really happened." In other words, when petitioner could not remember the truth, he would make it up. Pesante further revealed that it was difficult to tell whether petitioner remembered things, forgot things, or simply created the facts because he was "just too proud to admit he forgot."

Pesante testified Wearing could not remember discussing the plea agreement with Wilder. However, Pesante told petitioner he was "insane" to sign the plea agreement being offered.[10]

Pesante did not recall discussing petitioner's mental competency with either of his assigned counsel, but he related not being happy with Dr. Israel's psychological evaluation of Wearing. He did not believe Dr. Israel had been thorough enough. As a result, and just before sentencing, he instructed his wife, petitioner's mother, to secure petitioner's prior treatment records with the hope this would show that petitioner was not capable of understanding the plea agreement. It was Pesante's opinion that there was "no way" petitioner could have understood

----

examination if Pesante continued his efforts to control the presentation of his testimony in that fashion.

[10]Pesante did not clearly reveal whether this conversation occurred before the plea or after sentencing.

11

the plea agreement.[11]  He also remembered that his stepson responded to the court's sentence by exclaiming that, "This is b— s—!"  Moreover, he heard petitioner say three times, "This has to be appealed!"

Pesante remembered having a conversation with Wilder, either the day of or the day after sentencing, in which Pesante explained to Wilder that the gun was not petitioner's, petitioner "never sold more than a nickel bag,"and "there was plenty of evidence" questioning petitioner's competency.  Pesante even questioned Wilder concerning how it was "possible that an innocent person gets twenty-two years for no role" in the crime.  According to Pesante, Wearing has never stopped wanting to appeal.[12]

On cross examination by the Government's counsel, Pesante said he had no recollection of whether he received a copy of the affidavit filed by Wilder in this case, or of whether he contacted Wilder after petitioner instituted this case.  Pesante denied that Wearing had asked him to contact Wilder, or that he ever informed Wilder that Wearing had asked him to attest to things that were not truthful.  Pesante admitted that he had a lengthy, one and a half hour conversation with Wilder, either after petitioner's sentencing or at a later time, during which he provided Wilder with a great deal of information on Pesante's perceived merits of petitioner's defenses. Pesante related this information in his testimony before the undersigned.

As Pesante's testimony continued, he recalled a conversation with Wilder regarding the

_____

[11]There was no objection to Pesante's offering his opinion about petitioner's mental status. The opinion is not corroborated by any other evidence before the court in this case.

[12]When a question was posed to Pesante about petitioner's "§ 2255" action, Pesante informed the court that he was "not sure what a § 2255 is." Frankly, this struck the undersigned as most odd for an attorney who held himself out as practicing constitutional and civil rights law.

affidavit he filed in this case and Wilder's statement that he no longer would be involved with petitioner after that time. Pesante also informed the court that he would "do all [he] could to get an appeal" and to get petitioner out of jail. He reiterated that he had heard his "son" ask Wilder to appeal. Pesante further explained that, in his conversation with Wilder, he asked something to the effect, "Is an appeal possible?" To this Wilder responded that petitioner had waived his appeal rights, and that if he attempted to rescind the plea agreement, he "may face a greater sentence." Pesante admitted that he never followed up with Wilder, or with anyone for that matter, about whether an appeal had been filed or the status of an appeal.

**ANDREA WEARING PESANTE**

Andrea Pesante, petitioner's mother, testified that, though she assumed the need would be apparent, her son was not evaluated for any mental condition, even after his behavior began impacting his relationship with Ms. Phillips. At her son's request, she arranged the evaluation by Dr. Israel, explaining that the family wanted someone unconnected with the "system." When twice asked why she did not ask Wilder to secure an evaluation, her response each time was that Wilder had informed the family that anything could happen at sentencing, but that Wearing could receive between five and ten years. The closer it got to "trial," the more the family realized that "anything could happen." Then, Mrs. Pesante testified that she did ask Wilder to secure an evaluation in June 2006 just before his sentencing. She further provided the explanation that she did not ask Wilder to secure a mental evaluation, but then said she did ask even though she was told her son was not "eligible" for an evaluation "because" he had been "promised all along" he would get no more than ten years incarceration. As the sentencing drew close, she realized the "promise would not materialize" and Wilder had "no interest in securing an evaluation."

Case 7:07-cv-00253-NKM-BWC   Document 33   Filed 06/06/08   Page 13 of 29   Pageid#: 245

Mrs. Pesante stated that she "found" Dr. Israel in March 2006. Apparently, Wearing had researched Dr. Israel while in custody, and Wearing requested that the family engage his services. Mrs. Pesante could not recall whether they advised Wilder about the examination before it was performed. She could recall that, "he was made aware of it being done" only a matter of "days" before sentencing. The report was sent by facsimile on June 26, 2006, a day before sentencing.

Mrs. Pesante also related that she and her husband had a conversation with Wilder after sentencing in which he informed them things were "not working out," that Wearing had "little to offer the Government," but that Wearing would have a one-year "time frame" to provide information to the Government. She understood this to mean that petitioner would have one year to appeal.

On cross examination, Mrs. Pesante said she was disappointed with Dr. Israel. She wanted Dr. Israel, a psychologist, to focus on the "medical" aspects of petitioner's condition, and she believed he focused on the psychological aspects. She further revealed that a dispute arose with Dr. Israel over paying his bill, which she said eventually was resolved. Mrs. Pesante also testified that Wilder was a "wonderful person" who had her son's interests at heart.

**CHARLES BENNETT**

Charles Bennett is "engaged" to petitioner's aunt, and he was present at petitioner's sentencing. At first, Bennett testified that, immediately upon being sentenced, Wearing "definitely said" the case "had to be appealed." He further explained that both he and his fiancee were present outside the courtroom when Mr. and Mrs. Pesante had a conversation with Wilder, and that he "overheard" them talking about an appeal. He remembered the word "appeal" being used because "promises" had not been met. He never overheard any "promises" being made by

14

Wilder.

Bennett then denied hearing that the petitioner was promised anything. He explained that he was not part of the conversation, but simply was overhearing bits and pieces of the conversation.

**RASHADI ANDRE WEARING**

Petitioner testified that at the time of the evidentiary hearing he was taking two types of medication, but that they did not interfere with his ability to hear and understand the undersigned. He also understood that Mr. Spaulding, his counsel in this case, was not an adversary but was "on his side." He also testified that he understood the oath he had taken before testifying in this case.

Wearing related that he had been angry with Ms. Phillips for several reasons. First, she "showed me the Guidelines," which allowed for life plus ten years with the probability of thirty years, and then she said "maybe I should cooperate." Moreover, petitioner believed that Phillips had "lied" to him about filing a motion to withdraw and continue his criminal trial. He believed he was the one who requested the court remove her as counsel. He also described meetings with federal agents in which they told him that the Government would pursue his involvement with five grams of crack cocaine but would "drop" the gun charge.

Wearing related his prior experience with Wilder as assigned counsel in the state courts. He viewed Wilder as a "hired gun" who was "against me from the beginning." He believed Wilder was responsible for his receiving a partially suspended ten-year state sentence, which later was revoked, in part, because he violated his probation. The best the undersigned could perceive Wearing's testimony in this connection was that, if it were not for Wilder's participation

15

in his state court plea, which led to a partially suspended ten-year sentence, he never would have been put back in prison when he subsequently committed criminal acts that led to a probation violation. According to Wearing, Wilder knew of his mental illness, and he even had discussions with Wilder about some of the side effects of the medication.[13]

Petitioner testified that Wilder presented the plea agreement to him just before court, and he signed it. He explained that he answered "No" to the questions posed by the court relating to medical care and medications because, despite his wanting to go to trial, Wilder had instructed him not to do anything that "jeopardized the deal" which, according to petitioner, provided a ten-year "cap" on sentencing. He related that he was "sick that day," and all answers given were upon advice of his counsel, though he admitted never discussing with Wilder the questions the court would pose.

Wearing related that he lost his "cool" with Wilder "all the time," and that they "constantly argued." He further related that Wilder never informed him that the court could impose a life sentence, but that he was advised that, with a §5K motion, he would get no greater than ten years. Wearing testified that he was instructed by Wilder to "go along with the prosecution" and say and do whatever "was needed to get" the §5K motion.

Petitioner also related the reasons he wrote the fateful letter to AUSA Heaphy. He was housed with those in the "Westside Case," who seemed to be getting new sneakers and food for cooperating with the Government. He kept hearing how Heaphy was "customizing" or coaching their testimony, and how they were "going home" after they testified. He wanted to set up a

---

[13]Wearing's description of these conversations was graphic and clearly appeared to be a personal attack on Wilder.

16

meeting with Heaphy "to tell him about the lies he was hearing." The undersigned infers that this essentially was an effort to provide substantial assistance because, according to petitioner, "I had done all I could do, and they were looking for more."

Wearing stated that Ms. Phillips had planned to seek a competency examination which he claims Wilder did not pursue. In his words, Wilder "smiled" and "shrugged it off" every time Wearing mentioned the subject. This made petitioner very upset. While he could not state precisely why he did so, it is clear that, after the Heaphy incident, Wearing began pursuing a mental status examination on his own.[14]

Wearing never contemplated a sentence of twenty-two years. He testified that, upon being sentenced, he turned to his mother and said, "Mom, can you believe this? I'm going to die; you have to appeal this shit." Petitioner related that he was contemplating suicide and stated that he had communications with Wilder on June 30, 2006 in which Wilder tried to assure him "it would be okay." Petitioner admitted that no mention was made about an appeal during that conversation, and added that he "saw no reason to talk about an appeal" because he already had instructed Wilder to file one.

Petitioner also revealed that he had discussions about his mental condition with Rick Carter, the probation officer assigned to render a Presentence Report. He informed Carter of his

---

[14]There was evidence that, on July 18, 2005, petitioner sent a letter to the presiding judge complaining about Wilder's representation. (Pl's Exh. 4.) The court would learn in the Government's case that coincidently Wilder had written to petitioner on July 18, 2005 addressing his status as counsel, outlining the offer by the Government setting forth the results of his discussion with Probation, and counseling petitioner about his course of action *viz* the proposed plea agreement based on the evidence Wilder had reviewed up to that point and reminding petitioner that he would continue to prepare for trial should that be petitioner's desire. (Def's Exh. 1.)

past hospitalization and treatment by Dr. Tatum. He faulted Carter for not mentioning this in the Presentence Report.

On cross examination, Wearing acknowledged his initials and signature on the Plea Agreement. He also admitted that no promises of a ten-year sentence were made in that document. Petitioner related that he had no recollection of the plea proceedings and offered that he was "scared" at the time. Further, he admitted receipt of Wilder's July 18, 2005 letter. He denied both that Wilder ever went over the terms of the plea agreement with him prior to his signing it and that he was aware of its terms prior to entering his plea. By the same token, he did remember the term of the agreement in which he waived his right to appeal, quickly adding that Judge Moon told him he had a right to appeal. He acknowledged that he has been twice convicted of crimes of dishonesty.

Furthermore, petitioner acknowledged that he did not voice any complaints to the court about his counsel at the time he tendered his plea. When reminded that he had an opportunity to say anything he wanted about his counsel's representation, he responded, "For what? [The judge] had not rendered a sentence." Petitioner further conceded that he had ample time to meet with counsel, but he repeated that Wilder had told him not to do anything to "mess it up." Also according to the petitioner, Wilder told him before sentencing that he was unaware that the Government was not going to move for a §5K reduction. He repeated, however, that Wilder had promised him a ten-year sentence, though he never mentioned such a promise either at the time of his plea or at sentencing when questioned by the court.

Finally, petitioner identified the May 12, 2007 letter he wrote to Wilder. (Def's Exh. 3.) This letter informed Wilder of petitioner's recent meeting with an "inmate in the law library" in

18

which he told the inmate that he had directed Wilder to appeal, and the letter sought information about what Wilder had "heard" on his direct appeal. Wearing confirmed that he sent this letter the same day he filed the instant § 2255 petition.

**RESPONDENT'S CASE-IN-CHIEF**

**ANDREW WILDER, ESQ.**

Upon recall to the stand, Wilder categorically denied that the petitioner or his family ever said they wanted to appeal the sentence.[15] Wilder related a "long conversation" with the family after sentencing in which the circumstances, including the appeal waiver, were discussed. However, at no time was a request made that he appeal the case.

In addition, Wilder categorically denied ever promising to petitioner, or to anyone, that petitioner would receive a ten-year sentence. The only time the term "ten years" ever came up, according to Wilder, was in the context of referring to the mandatory minimum to which petitioner could be sentenced under the charges he faced.

Wilder related that, when they met to discuss the final plea agreement, he could not recall whether the petitioner actually read it. However, he read the plea agreement to petitioner "paragraph-by-paragraph." He never experienced petitioner suffering slurred speech in any of his contacts. Wilder was aware that petitioner blamed him for the three probation violations he had incurred for smoking marijuana, and that if he had not been sentenced to probation in the prior state court criminal proceeding, he never would have been in a position to have violated probation.

---

[15]Neither side invoked the exclusionary rule on witnesses. Thus, all witnesses observed the entire evidentiary proceeding.

19

Referring again to the post-sentencing conversations with petitioner's family, Wilder stated that it was "possible" he mentioned that petitioner would have up to one year in which to obtain a §5K reduction in his sentence. He denied that the term "appeal" ever was mentioned in that context. Furthermore, he related a conversation he had with Pesante in June 2007, after Wilder had filed his affidavit in this case. Pesante called and advised that petitioner had passed the affidavit along to him. Pesante expressed to Wilder that he was "troubled" because his "son" had asked him to make statements to the court that "were not true." Pesante wondered whether Wilder would be involved any further. When Wilder informed Pesante that he would have no further involvement in the case after filing his affidavit, Pesante responded, "I have decided to do what my son asked."

On cross examination by petitioner's counsel, Wilder revealed no recollection of the probation "debriefing," and he admitted petitioner was on medication for a bipolar disorder at the time. When asked why he did not move the court for a mental examination, Wilder explained again that he had an ample basis from the extant evidence, including family testimony, to argue for a lower sentence based on petitioner's mental and emotional status. He did not believe he ever could prove petitioner suffered a significant enough mental illness for an evaluation to be of benefit at sentencing. As it turned out, Dr. Israel's report confirmed for him exactly what he suspected about the nature of petitioner's mental status. Finally, Wilder denied that petitioner was unaware of the terms of the plea agreement because he read the plea agreement to him.

## WITNESS DEMEANOR AND THE MANNER OF THEIR TESTIMONY

While the presiding court may see the bald statements of the witnesses from the above summaries and from the transcript of these proceedings, little can be gleaned about their

20

demeanor and the manner in which they testified without some further description. The conduct of some of these witnesses during the hearing bears on the weight the undersigned will assign to their testimony, either in whole or in part.

Petitioner, his stepfather and his mother testified at length regarding his mental status. It is understandable that each has a stake in the outcome of the case. Pesante, in particular, offered the court a detailed account of petitioner's inability to concentrate, remember and accurately and truthfully recount historical facts. Nevertheless, petitioner continuously communicated with his appointed counsel, either in writing or verbally, during the hearing in what the undersigned observed was an effort to direct the progress of his case. Though Wearing denied having any memory of details, he was able locate documents from the significant stack at counsel table, he could quote page numbers and dates from the documents at counsel table, and he actually facilitated the use of the documents in the case. There also were times when Wearing simply contradicted himself. This usually occurred when he responded to questions in ways that could be viewed as unfavorable to his case, and he seized the opportunity to explain. The undersigned observed that petitioner would catch himself and, then, either offer an explanation or shift blame to someone or something else. In the main, he came across as calculating his every interaction with the court, with his own counsel and with counsel for the Government in a way that communicated manipulation. The undersigned rarely has experienced the degree of manipulation attempted to be exercised by a party or witness as observed in this case.

Pesante's testimony was punctuated by efforts to deflect questions posed to him by counsel or the court, and then to remake the question in a way so as to provide the answer he wanted the court to hear, irrespective of its responsiveness to the original question. The

Case 7:07-cv-00253-NKM-BWC   Document 33   Filed 06/06/08   Page 21 of 29   Pageid#: 253

undersigned reminded Pesante several times that he was not the lawyer for his stepson in this case, but merely a witness who was to be responsive to what was asked, not to the question he wanted to pose. His demeanor while on the stand was nothing short of dramatic, and it diminished the value of his testimony to the undersigned. Furthermore, it was most difficult for the undersigned to accept that an attorney who concentrates in the area of constitutional and civil rights law would respond to a question about discussions with Wilder after petitioner filed the instant § 2255 action with a statement to the effect that, "I am not sure what a § 2255 is." Finally, when it came to discussing the quality of Wilder's representation, Pesante did not distinguish between what the petitioner had related to him, on the one hand, and his own first-hand knowledge, on the other, until the undersigned called attention to it. Much of what Pesante related to the court about various events during the pendency of petitioner's case were told to him by petitioner, who Pesante eventually conceded easily could have constructed them as true in his own mind. Thus, the weight given to Pesante's testimony related to what petitioner knew or did not know, and the facts supported either conviction or acquittal, as a whole, is greatly diminished in the undersigned's eyes.

Mrs. Pesante's effort to explain the family's pursuit of a mental status examination, at best, was confusing. She essentially laid out several inconsistent, alternative reasons for securing the examination. She first explained that her son's mental impairment was so obvious that she thought Wilder would have "pick[ed] up the ball." Upon further examination, she then explained that no examination was sought because her son had been "promised" no more than ten years, while conceding that Wilder had informed them "anything could happen." Later Mrs. Pesante appeared to admit that no one initially sought a mental status examination, but that, as sentencing

22

approached, it became clear the "promise" would not materialize.[16] Even though she complied

with her son's request to secure a consultative examination by a specialist he had chosen based

on his own research, Mrs. Pesante then expressed dissatisfaction with the lack of favorable

results because she felt the report was too psychological and not sufficiently "medical."

The credibility of Mr. Bennett's testimony about whether Wilder was directed to appeal

was shaken when he later conceded that he was not a party to the conversations but only

overheard bits and pieces of the post-sentencing conversations between Mr. and Mrs. Pesante and

Wilder. Mr. Bennett's earlier, rather categorical, statement was contextualized, if not

contradicted, by his later testimony that the best he could say was that he heard the word "appeal"

being used from time-to-time.

While Wilder's credibility has been put in issue by the contradictory evidence offered by

petitioner and his witnesses, there was nothing about his demeanor or the manner of testifying

that caused the undersigned to question his forthrightness. Wilder admitted his failure to catch

the petitioner's inaccurate answer to questions by the court at the Rule 11 hearing concerning

petitioner's medical treatment and medications. Wilder undertook no effort to avoid answering

questions, and he did not give the appearance of tailoring answers so as to protect or advance any

personal interests.

**LEGAL PRINCIPLES**

### Ineffective Assistance of Counsel Standard

---

[16]At this juncture in Mrs. Pesante's testimony, it was difficult to discern what she meant by "promise." This is so because there was a great deal of crossover in her assertions that a promise of a particular sentence was made, on the one hand, and, on the other, that the only hope petitioner had for any lessening of his sentence lay in his substantial assistance. The latter, of course, is no promise at all, only a hope the Government would move for a reduction.

23

In order to establish that petitioner's trial counsel provided him with ineffective assistance, he must show: (1) that trial counsel's performance was objectively unreasonable, and (2) that the petitioner was prejudiced by the deficient performance in that there is a reasonable possibility that the outcome would have been different if not for counsel's deficiency. *See Strickland v. Washington*, 466 U.S. 668, 692-694 (1984); *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005). Trial counsel must consult with the defendant about his right to file an appeal when there is reason to believe that a rational defendant would want to appeal, or when the defendant reasonably demonstrated to the attorney that he had an interest in filing an appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000); *United States v. Poindexter,* 492 F.3d 263, 268 (4th Cir. 2007). Thus, what counsel knew or should have known about his client's interests in appealing is important, and factors relevant to this inquiry include whether the conviction followed a guilty plea which, itself, "reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Flores-Ortega*, 528 U.S. at 480. In those cases where the defendant pleads guilty, the court must consider factors such as whether the defendant received his bargained for sentence and whether the plea agreement contained a waiver of appeal rights. *Id.*

**FINDINGS AND CONCLUSIONS**

The undersigned finds that petitioner has failed to prove by a preponderance of the evidence that he received ineffective assistance of counsel regarding his right to appeal. First, the evidence fails to show that Wilder was unequivocally directed by his client to appeal, or that he failed to counsel petitioner about an appeal. Admittedly, the evidence is in serious conflict, but the undersigned cannot fully credit petitioner's testimony or that of his witnesses.

24

The preponderance of the evidence shows that everyone associated with the defense was surprised, even shocked, by the court's sentence. While severe, the statutory range was ten years to life, and there is no suggestion that the actual sentence was beyond that recommended by the Guidelines. The undersigned is sure that upon receiving his sentence, petitioner's first reaction was to curse and seek some way to soften its impact. He likely did express his dissatisfaction, maybe even in words to the effect, "This needs to be appealed." However, petitioner testified that he knew under the plea agreement, and he heard the presiding District Judge tell him, he had waived his right to appeal any sentence. That is borne out by the transcript of the sentencing proceedings. Petitioner also knew, and the undersigned finds he understood, that while he had made proffers of assistance, his letter writing hardened the Government against moving for any reduction, though he still had a one-year period to continue efforts in that direction. Therefore, in the context of this case, the undersigned cannot construe petitioner's immediate post-sentencing reaction to be a direction to Wilder to appeal.

There is no question that petitioner's family met with Wilder about what could be done in light of such a severe sentence. Equally, there is no question that the subject of an appeal was discussed along with the subject of a later reduction within one year of judgment. Interestingly, petitioner did not participate in any post-sentencing conversations between Wilder and his family. Thus, the undersigned cannot find that these conversations were anything more than for information. The family was not Wilder's client, and though a defendant may authorize another person to pass along his direction to counsel to appeal, there is insufficient evidence of that in this case. That failing, only the defendant can direct his counsel to appeal.

Though the subject of an appeal was discussed, the undersigned has no confidence in the

25

evidence offered by the Pesantes or Bennett, to the extent it purported to demonstrate that Wilder was directed to file an appeal. Put another way, petitioner's witnesses did not satisfy the undersigned by a preponderance of the evidence either that the Pesantes had the authority to direct Wilder to appeal, or that they actually directed Wilder to appeal on petitioner's behalf.

As to the balance of the issues referred by the presiding District Judge, the undersigned REPORTS as follows:

A. The Plea Agreement

Wilder did not mislead the petitioner regarding any aspect of the plea agreement. In fact, quite the opposite is true. The preponderance of the evidence demonstrates that Wilder went over every part of the plea agreement, paragraph-by-paragraph, and petitioner entered into the agreement knowingly and voluntarily. However, petitioner wanted to discuss with Wilder only those things on his agenda, which rendered all communications between Wilder and petitioner difficult. None of this, however, hindered petitioner from understanding and voluntarily accepting the terms of the agreement. Moreover, simply because petitioner did not like the Government's decision which declined to offer a specific sentence, or its later decision not to file a motion to reduce his sentence, is a far cry from his failing to understand those things to be facts.

Despite Mr. Pesante's ruminations to the contrary, the record in this case shows more than ample evidence of petitioner's guilt. There is no question in the undersigned's mind that petitioner knowingly and voluntarily faced that evidence by executing the plea agreement and tendering his plea of guilty to the court.

The preponderance of the evidence fails to support petitioner's allegations that Wilder

26

informed or "promised" petitioner, or any of his family, that he would receive a particular sentence, much less one with an upward limit of ten years. Neither the plea agreement nor the plea colloquy before the District Judge give any hint of such. Instead, the evidence shows that petitioner had fully cooperated with federal agents, in exchange for which he was given only an opportunity, not a right, to affect the length of the sentence imposed by the court by providing substantial assistance within the period allowed by the law. The unabridged discretion to file such a motion, however, lay with the Government. Petitioner killed any chances for that when he wrote the letter to AUSA Heaphy creating problems in an unrelated case.

B. Medications Hindering Petitioner's Ability To Understand

The preponderance of the evidence does reveal that Wilder failed to inform the court that petitioner had been or was under the care of physicians, and that he was taking medications. Such performance was not objectively reasonable.

By the same token, Wilder did not improperly fail to inform the court that petitioner was under the influence of medication which hampered petitioner's ability to understand the proceedings. The preponderance of the evidence demonstrates to the undersigned that petitioner, in fact, was not under the influence of medication which hampered his ability to understand the proceedings. To the contrary, the undersigned finds that petitioner's conduct has been consistent throughout the underlying criminal and post-judgment proceedings, even the hearing before the undersigned. To put it succinctly, there is little the petitioner does not understand. Instead, from what the undersigned observed and heard at the hearing, petitioner simply converts his failed efforts to control the circumstances to an alleged lack of understanding.

Petitioner's own testimony belies his claim here that he was under the influence of

27

medications which hampered his ability to understand the proceedings. The undersigned does not believe petitioner's testimony that he was strictly following Wilder's advice when he signed the plea agreement and untruthfully answered questions posed by the court relating to his medical care and medications. Petitioner testified: 1) he was told not to do anything to "jeopardize the deal;" 2) he was to "go along with what the prosecution says;" and 3) all his answers were provided "on advice of counsel." To have carried out those instructions on the day of the plea proceedings, and to have remembered the details of that day while maintaining an alleged lack of understanding, takes a great deal of understanding. Essentially, it is at this point that petitioner's evidence turns on itself and consumes the whole.

### C. & D. Failure To Argue *Booker* And The Impropriety Of An Enhanced Sentence

Wilder did not fail to argue that petitioner's sentence was unreasonable, nor did he fail to argue the impropriety of an enhanced sentence. First, these types of arguments would be ones reserved for appeal, which will be addressed below. Notwithstanding, the great weight of the evidence, including the transcript of the sentencing proceedings, shows that Wilder introduced evidence relating to, and he sought, a downward departure despite the fact that the plea agreement foreclosed the petitioner's right to make such request. Had petitioner filed a motion before sentencing for a downward departure, or had he filed a post-sentencing motion challenging the propriety of the sentence, the Government could have considered this to have been a breach of the agreement, exposing petitioner to more serious consequences. Pesante's protestations at the hearing before the undersigned were to the contrary, but there was significant and ample evidence that petitioner was guilty of both the gun and drug conspiracy charges. Wilder's "back door" efforts seeking leniency clearly were made to benefit the petitioner, though

28

they were not successful.

**RECOMMENDATION**

For the forgoing reasons, the undersigned hereby RECOMMENDS that an Order enter DENYING petitioner's motion to vacate his sentence and DISMISSING this action from the docket of the court.

The Clerk is directed to immediately transmit the record in this case to Honorable Norman K. Moon. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(l)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk is directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED:

_____
U. S. Magistrate Judge

6|6|08
Date

29